**FILED**
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

MAY 16 2001

*[signature]*
CLERK

GIGI G. LEBOW,

    Plaintiff,

vs.    Civ. No. 00-1073 BB/RLP

LARRY G. MASSANARI,
Acting Commissioner of Social Security,

    Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## ANALYSIS AND RECOMMENDED DISPOSITION[1]

1.     Plaintiff, Gigi G. Lebow ("Plaintiff" herein), applied for Supplemental Security Income benefits in June 1997. She alleges disability caused by post traumatic stress disorder and depression.[2] (Tr. 50-53). Plaintiff's claims were denied at the first and second levels of administrative review. (Tr. 31-32). An Administrative Law Judge ("ALJ" herein) subsequently denied Plaintiff's claim, finding that her impairments were not "severe." (Tr. 16-28). The Appeals Council declined to review the ALJ's decision. (Tr. 6-7). Accordingly, the ALJ's decision became the final decision of the agency.

### I.     Facts

2.     Plaintiff endured several incidents of sexual harassment and assault in 1996 while on the job.

---

[1]Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

[2] Medical records also establish that during the relevant time period she was treated for glaucoma, hypothyroidism, muscle aches and torn ligaments in her right knee.



(Tr. 268). She terminated her employment as of July 5, 1996, the date she alleges her disability began. (Tr.55, 60, 101, 268). Thereafter, she worked 20 hours per week at a domestic violence center for approximately 3 months [3]. (Tr. 79). In written reports, she stated that she quit working because of increased depression and difficulties working around men. (Tr. 60, 85).

3. Plaintiff sought mental health care on June 16, 1997, for problems stemming from the harassment and assault, and was seen at West Pines Psychiatric Service by Bruce Baca, a licensed social worker. Mr. Baca noted that Plaintiff exhibited tremors, tearfulness, sobbing, hyper-motor activity and poor eye contact, and that she complained of low coping skills, sleep disturbance, stomach problems, nervousness, dreams of the sexual assault, fear and isolation. (Tr. 133-135). He diagnosed post-traumatic stress disorder - severe. (Tr. 135). Plaintiff returned to Mr. Baca on June 23, 1997. At that time he referred her to Jerry Dodson, M.D., for medication evaluation, due to the "continued high degree of her symptomotology presentation." Id. Dr. Dodson evaluated Plaintiff on August 6, 1997. Based on a documented history and mental status examination, Dr. Dodson diagnosed bipolar disorder, mixed and post traumatic stress disorder, and placed Plaintiff on *Lithium*[4]. (Tr. 155). One month later, Mr. Baca noted, "Ms. L notes stabilization of Bipolar Dis(order) somewhat difficult. ___ of med. side effects discussed and ref(erred) to J. Dodson, M.D." (Tr. 151). *Lithium* was discontinued on September 19, 1997 because it exacerbated intra-ocular pressure associated with an underlying condition of glaucoma. (Tr. 153). Dr. Dodson replaced the

---

[3]The record is somewhat confusing as to the dates Plaintiff worked at the domestic violence center. In a work background report prepared on November 3, 1998, Plaintiff stated that she worked at the shelter from November 1997 to February 1998. (Tr. 117). However, Plaintiff listed this job in her application for SSI benefits, prepared on July 2, 1997. (Tr. 79).

[4]*Lithium* is indicated in the treatment of manic episodes of manic-depressive illness. 1999 Physicians' Desk Reference, pp. 3051-3051.

2

*Lithium* with *Depakote*[5] on October 10, 1997. Id. *Zoloft*[6] was added by Plaintiff's gynecologist on October 22, 1997. (Tr. 155, 233). On October 23, Plaintiff complained to Dr. Dodson of increased depression, and not liking the feeling she had on Depakote. Dr. Dodson continued her on Depakote[7] (Tr. 155).

4. Arun Patel, M.D., evaluated Plaintiff on October 27, 1997, at the request of Disability Determination Unit. (Tr. 121-123). He recorded her complaints as follows:

> She said that her anxiety is marked by her feeling shaky, nervous, having panicky feelings. She feels depressed and has had mood swings. She said the symptoms of depression include sad moods, low energy and hedonia, isolation, easy fatigability, feelings of hopelessness and helplessness. This would last for several weeks to several months at a time, alternating with highs, when she would feel increased energy, flight of ideas, irritability, argumentativeness. During this time she also becomes angry, exhibits poor impulse control. She totaled her car in one of these highs. She said she gets unusually happy and "silly." Her speech increases. She does not need to sleep as much and her energy level goes up. She "cleans my house a lot." She also develops symptoms of anxiety during this time and has racing thoughts.
>
> At home, the responsibilities that she has include cooking, cleaning. Paying bills is usually done by her and her husband. She needs no help with bathing or feeding herself. She does drive. She experiences mild anxiety around people. She does not go to church.

(Tr. 121).

5. Dr. Patel conducted a mental status exam, documenting the following:

---

[5]*Depakote* is an anti-convulsant used for the treatment of manic episodes. (Tr. 167)

[6]*Zoloft* is for the treatment of several psychiatric conditions, including depression. 1999 Physicians' Desk Reference, pp. 2443-2448.

[7]Initially, there was difficulty in determining the correct dosage of Depakote. A blood test dated November 11, 1997, indicated that Plaintiff had toxic levels of Depakene in her system. Testing on November 26, 1997, indicated sub-therapeutic levels. By March 1998, the level was in an acceptable range. (Tr. 141, 145-146).

3

   (1)   Appearance - casually dressed. Looks appropriate to stated age.

   (2)   Initially poor eye contact which improved during interview.

   (3)   Rate of speech - copious in amount.

   (4)   Organized, non-psychotic thoughts, with no perceptual disturbances.

   (5)   Dysphoric, anxious, somewhat elated mood.

   (6)   Constricted affect, at times becomes too giggly.

   (7)   Sensory and cognition - alert and oriented x 3; able to name presidents to Nixon, able to state similarities and differences adequately, able to spell "world" forwards and backwards without difficulty. Some difficulty with serial 7s. Able to recall 3/3 immediately, and 2/3 after distract. Average fund of knowledge, average intelligence.

   (8)   No dangerous ideations

   (9)   Adequate impulse control at this time

   (10)  Fair insight

   (11)  Fair judgment.

(Tr. 122).

Dr. Patel diagnosed Bipolar Disorder, Mixed, assessing Plaintiff's GAF (Global Assessment of Functioning) as 70, both currently and for the prior year. (Id.)

6.   Plaintiff continued to receive counseling at West Pines Psychiatric Service approximately once a month for marital problems and anxiety. (Tr. 151). *Luvox* and *Paxil*[8] were added to her prescription regimen. (Tr. 152, 166, 169).

7.   Plaintiff's psychiatrist, Dr. Dodson, closed his practice as of April 20, 1998. (Tr. 150).

---

[8]Plaintiff testified that these medications were prescribed for anxiety. She stopped taking *Paxil* because it caused her to break out in welts, and that prescription refills for *Luvox* were denied by her Medicaid provider. (Tr. 285).

4

Plaintiff saw no mental health care providers from May 1998 to the date of her administrative hearing, November 3, 1998. (Tr. 280). She testified that she had been unable to obtain mental health care during that time because of a change in the way Medicaid was administered. (Tr. 281). In the meantime, she had surgery for a knee injury, but was returned to full physical activity as of September 24, 1998. (Tr. 205, 203). She also work 25-30 hours every 6 weeks as a contract hearing reporter for Social Security Administration.[9] (Tr. 110, 42-44).

8.     Plaintiff was seen by Son Vi Nguyen, M.D. a psychiatrist, on November 5 and November 20, 1998. (Tr. 225, 229-230). He continued Plaintiff on *Depakote*, and replaced *Zoloft* with *Celexa*. (Tr. 226,. 226). On November 20, 1998, Dr. Nguyen indicated that due to her emotional state, Plaintiff would be unable to work for three months, and that he hoped she would improve with proper care. (Tr. 225). Shortly thereafter Plaintiff was seen by her primary care doctor, William Crowley, D.O. Although those treatment records are not in the file, other records indicate that as of December 8, 1998, Dr. Crowley had switched Plaintiff back to *Zoloft* and added *Amitryptaline*. (Tr. 255, 242). When he saw Plaintiff on December 18, 1998, Dr. Nguyen noted that she was "obviously better" on *Zoloft*. He discontinued *Celexa*, and prescribed *Desryel*[10] in lieu of *Amitryptaline* for sleep. (Tr. 255, 242-243). Dr. Nguyen saw Plaintiff again in 1999. (Tr. 255). The date of this visit is not discernible from the administrative record. At that time he noted that Plaintiff had been doing fairly well, feeling better with no more visible symptoms of depression.

---

[9] The ALJ noted Plaintiff's employment at the domestic violence center and for the Social Security Administration. He did not determine whether this work constituted substantial gainful activity, choosing instead to proceed to step two of the sequential evaluation process. (Tr. 17). For the purposes of this appeal, the Court assumes that Plaintiff's work attempts do not constitute substantial gainful activity.

[10] *Desyrel* is an anti-depressant. 1999 Physicians' Desk Reference, pp. 539-541.

5

9.      Plaintiff resumed mental health counseling with Susan Tatum, LPCC. (Tr. 227). She saw Ms. Tatum on seven occasions between November 7, 1998 and February 22, 1999, the date of the ALJ's decision. (Tr. 239-245). Ms. Tatum evaluated Plaintiff's mental status on these visits, documenting abnormalities in Plaintiff's activity level (lethargic) mood (described variously as sad, anxious, expansive and dysphoric), affect (flat, labile) and thinking (loose associations), and counseled Plaintiff with regard to complaints involving depression, anxiety, paranoia, marital problems and employment. On November 24, 1998, after her initial two sessions with Plaintiff, she prepared a letter stating "It is my professional opinion that (Plaintiff) is unable to return to work at this time due to her mental state." (Tr. 224).

## II.    The ALJ's Decision

10.     The relevant portion of the ALJ's decision concerns his evaluation of the severity of Plaintiff's established mental impairment of post traumatic stress disorder and bipolar disorder. The ALJ found that Plaintiff's mental condition was not severe because:

> First, the claimant has not been consistent with psychiatric treatment, in the form of medication, or through counseling. She was treated by Dr. Dobson (sic) from August, 1997 through March, 1998. (citation omitted). In September, 1997, Dr. Dobson (sic) notes the claimant reported "stabilization of bipolar" (referring to Tr. 151). The balance of his records appear to document problems within her marital relationship, and are void of references to functional limitations imposed by any mental condition. Following Dr. Dobson (sic) closing his practice in April 1998, the claimant did not seek psychiatric treatment for more than six months, and her renewed treatment did not begin until after the hearing in this matter.
>
> Indeed, when the claimant renewed psychiatric treatment in November 1998, her treating sources believed any mental limitation stemming from her condition would be short lived (referring to Tr. 225); further, specifics regarding what functional limitations preclude work activities, much less the expected duration of such limitations, is not identified. (referring to Tr. 224).
>
> Finally, I note that symptoms reported to the Administration are not consistent with

6

> those reported to her treating sources. For example, she has indicated she has difficulties with her vision secondary to her glaucoma; nonetheless, her treating source reports to difficulty with her ability to see. Such exaggeration of her symptoms significantly undermines her credibility with regard to the impact of other symptoms she may be experiencing.

(Tr. 23).

At an earlier point in his decision, the ALJ also cited to the report of Arun D. Patel, M.D., the reports of non-examining, non-treating psychologist and psychiatrists and his evaluation of Plaintiff's credibility. The ALJ mentioned, and apparently discounted, the records of Ms. Tatum, and treating psychiatrist, Dr. Nguyen, characterizing them as "one time" evaluations.[11] (Tr. 20).

### III. Issues on Appeal

11. Plaintiff seeks reversal and remand for additional proceedings. Among other grounds, Plaintiff contends that the ALJ erred in his evaluation of her credibility.

### IV. Standard of Review

12. I review the ALJ's decision on the entire record "to determine whether the findings are supported by substantial evidence and whether the Commissioner applied correct legal standards." Pacheco v. Sullivan, 931 F.2d 695, 696 (10th Cir.1991).

### V. Analysis

13. To qualify for disability benefits, plaintiff must establish a severe physical or mental impairment which is expected to result in death or last for a continuous period of twelve months and which prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. 423(d)(1)(A).

---

[11] The records before the ALJ documented two treatment sessions between Plaintiff and Dr. Nguyen, and Plaintiff and Ms. Tatum. The Appeals Council had before it records documenting additional counseling sessions between Plaintiff and Ms. Tatum.

7

To determine disability, the Commissioner has established a five step sequential evaluation process. Id. The sequential evaluation process ends if at any step the Commissioner finds that the claimant is or is not disabled. Id. At step two, the ALJ determines whether plaintiff has a severe impairment or combination of impairments.

14. The determination of whether a claimant's impairments are severe or not severe must be made with "great care." Soc. Sec. Rul. 85-28. While a claimant has the burden of proving his or her disability, at step two that burden is "*de minimis*." Williams v. Bowen, 844 F.2d 748, 751 (10th Cir. 1988).

15. Dismissing an application for benefits at step two is justified only for "those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." Bowen v. Yuckert, 482 U.S. 137, 153, 107 S. Ct. 2287, 2297, 96 L. Ed. 2d 119 (1987). A claim may be denied at step two only if an individual's impairments, singly or in combination, "do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities." Soc. Sec. Rul. 85-28. In this case, the ALJ found that Plaintiff had established a medically determinable mental impairment (post traumatic stress disorder and bipolar disorder) that could reasonably be expected to produce the symptoms including difficulty working with men, anxiety, and sadness. (Tr. 20). "[O]nce the requisite relationship between the medically determinable impairment(s) and the alleged symptom(s) is established, the intensity, persistence and limiting effect of the symptom(s) must be considered along with the objective medical and other evidence in determining whether the impairment or combination of impairments is severe." Soc. Sec. Rul. 96-3p. The ALJ found that Plaintiff exaggerated her symptoms and functional limitations, and determined that her mental impairment

8

was not severe. (Tr. 20- 24).

16.     My review of the record convinces me that the ALJ relied on a misreading of the evidence in several instances in his evaluation of Plaintiff's credibility.  The following are examples:

--      The ALJ found that Plaintiff had not been consistent in taking psychiatric medication. (Tr. 23). In support of this finding he relied on an October 3, 1997, note from Plaintiff's osteopathic physician, Dr. Crowley, indicating that she had ceased taking Lithium, and refused to take Valporic acid. (Tr. 19, referring to Tr. 148). The ALJ, however, ignored crucial evidence in relying solely on Dr. Crowley's note to characterize Plaintiff's use of medication. When this note was made Plaintiff was seeing Dr. Dodson, not Dr. Crowley, for management of psychotropic medication. Dr. Dodson had discontinued use of Lithium because of deleterious side effects. Plaintiff began taking Depakote in October 1997, and continued to take it despite complaints of how it made her feel.

--      The ALJ found that Plaintiff had not been consistent in obtaining counseling, relying on Plaintiff's failure to obtain psychiatric treatment for six months following the closure of Dr. Dodson's office, and the fact that her renewed treatment did not start until after her administrative hearing. (Tr. 23). Plaintiff, however, testified that her inability to obtain mental health counseling was due to a change in the way Medicaid was accepted. (Tr. 281). No contrary evidence was elicited. She saw Dr. Nguyen on November 5, 1998, two days after her administrative hearing, returned to him for a follow up visits, and started regular counseling with Ms. Tatum.

--      The ALJ found that Plaintiff had reported "stabilization" of her bi-polar disorder to Dr. Dodson on September 17, 1997. (Tr. 23). The note referred to actually states that she

9

reported stabilization was difficult. (Tr. 151).

- The ALJ found that Plaintiff's symptoms, as reported to the Social Security Administration, were not consistent with those reported to her treating physicians. He gave only one example to support this finding, that Plaintiff complained that glaucoma caused vision difficulties, while her treating eye doctor indicated that glaucoma did not impair her ability to see. Plaintiff testified that her vision problems started while she was taking Lithium. (Tr. 271). She did not testify that those problems were disabling. Plaintiff's eye doctor submitted a letter stating that glaucoma did not cause "disabling" vision problems. The letter did not state whether or not Plaintiff experienced non-disabling vision problems. (Tr. 172).

16. The court ordinarily defers to the ALJ as trier of fact on credibility. Thompson v. Sullivan 987 F.2d 1482, 1489 (10th Cir. 1993). However, deference is not an absolute rule. See Frey v. Bowen, 816 F.2d 508, 517 (10th Cir. 1987) (reversing ALJ on credibility). The ALJ's " '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.' " Huston v. Bowen, 838 F.2d 1125, 1133 (footnote omitted) (10th Cir. 1988), cited in Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995). The ALJ must "articulate specific reasons for questioning the claimant's credibility" where subjective pain testimony is critical. Kepler v. Chater, 68 F.3d at 391. (internal quotations omitted). When a claimant has demonstrated a medically determinable impairment capable of producing pain, or in this case, mental impairment, the "ALJ must carefully consider all the relevant evidence, including subjective pain testimony, and expressly reflect that consideration in his findings." Huston v. Bowen, 838 F.2d at 1133.

17.     The Court is cognizant of Dr. Patel's evaluation of Plaintiff, relied upon by the ALJ and by the non-examining agency physicians, assigning her a GAF of 70. A GAF of 70 is indicative of mild symptoms or some difficulty in social, occupational or school functioning, but generally functioning pretty well with some meaningful personal relationships. Diagnostic and Statistical Manual of Mental Disorders, 4th Ed. p. 32. At a subsequent step of the sequential evaluation process, this score may be substantial evidence of functional capacity adequate for a finding of not disabled. At step two, however, it is indicative of more than a "minimal" effect on the ability to perform basic work activities.

18.     Given the minimal burden of proof on Plaintiff at step two of the sequential evaluation process and the ALJ's misreading of the record, I find that the requisite care necessary for a determination of a claimant's credibility is lacking in the ALJ's decision. For this reason, I recommend that the Commissioner's decision be reversed and the case remanded for additional proceedings. In recommending this remand, I do not direct any particular result. The remand would simply assure that correct legal standards are invoked in reaching a decision, based on the facts of this case. Kepler v. Chater, 68 F.3d at 387; Huston v. Bowen, 838 F.2d at 1132

19.     I do not reach the additional issues raised by Plaintiff. These matters my be mooted by the proceedings conducted and/or disposition reached on remand.

11

## VI.  Recommended Disposition

20.  I recommend that Plaintiff's Motion to Reverse be granted, and that this matter be remanded to the Commissioner for additional proceedings consistent with this Analysis and Recommended Disposition.

RICHARD L. PUGLISI
UNITED STATES MAGISTRATE JUDGE